# IN THE UNITED STATES DISTRICT COURT

# FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BENJAMIN C. RESNICK, | CASE NO. 3:15-cv-00233-RDM-GBC |
| Plaintiff, | (JUDGE MARIANI) |
| v. | (MAGISTRATE JUDGE COHN) |
| CAROLYN W. COLVIN, ACTING COMMISSIONER OF SOCIAL SECURITY, | REPORT AND RECOMMENDATION TO VACATE THE DECISION OF THE COMMISSIONER AND REMAND THE CASE TO THE COMMISSIONER FOR FURTHER PROCEEDINGS |
| Defendant. | Docs. 1, 9, 10, 11, 12, 13 |

## REPORT AND RECOMMENDATION

### I.      Procedural Background

On February 3, 2012, Benjamin C. Resnick ("Plaintiff") filed as a claimant for disability insurance benefits under Title II and XVI of the Social Security Act, 42 U.S.C. §§ 401-34, 1181-1183f, with a date last insured of December 31, 2016,[1] with a claimed disability onset date of December 5, 2011.   (Administrative Transcript (hereinafter, "Tr."), 18).   After the claim was denied at the initial level of administrative review, the Administrative Law Judge (ALJ) held a hearing on July 11, 2013.  (Tr. 35-64).  On July 17, 2013, the ALJ found that Plaintiff was not

---

[1]  Disability insurance benefits are paid to an individual if that individual is disabled and "insured," that is, the individual has worked long enough and paid social security taxes. 42 U.S.C. §§ 415(a) and 416(i)(1). The last date that a claimant meets the requirements of being insured is commonly referred to as the "date last insured." *See* 42 U.S.C. § 416(i)(2); *accord Renfer v. Colvin*, No. 3:14CV611, 2015 WL 2344959, at *1 (M.D. Pa. May 14, 2015).

disabled within the meaning of the Act.  (Tr. 15-34).  Plaintiff sought review of the unfavorable decision, which the Appeals Council denied on December 17, 2014, thereby affirming the decision of the ALJ as the "final decision" of the Commissioner.  (Tr. 1-6).

On February 2, 2015, Plaintiff filed the above-captioned action pursuant to 42 U.S.C. § 405(g) and pursuant to 42 U.S.C. § 1383(c)(3), to appeal a decision of the Commissioner of the Social Security Administration ("SSA") denying social security benefits.  (Doc. 1).  On April 10, 2015, the Commissioner ("Defendant") filed an answer and an administrative transcript of proceedings.  (Doc. 9, 10).  On May 1, 2015, Plaintiff filed a brief in support of the appeal.  (Doc. 11 ("Pl. Brief")).  On June 2, 2015, Defendant filed a brief in response.  (Doc. 12 ("Def. Brief")).  On June 15, 2015, Plaintiff filed a reply brief.  (Tr. 13 ("Reply")).  On January 8, 2016, the Court referred this case to the undersigned Magistrate Judge.

## II. Relevant Facts in the Record

### A. Education, Age, and Vocational History

Plaintiff was born in August 1971, and thus was classified by the regulations as a younger person as of the date of the ALJ's decision.  20 C.F.R. § 404.1563(c); (Tr. 22).  He completed two years of technical school and received an associate degree.  (Tr. 38-39, 210, 350, 477).  Earnings reports demonstrate that Plaintiff had

earned four quarters of coverage annually[2] from 1997 to 2011, worked for one employer for five years and another employer for eight years.  (Tr. 182, 184-187). Plaintiff worked from 1997 to 2011 for nine different employers.  (Tr. 184-187).

## B. Relevant Treatment History

### 1. Baughman Family Medicine: Paul J. Baughman, D.O.; Adam Hellyer, P.A.-C

On February 8, 2012, Plaintiff brought disability forms for Dr. Baughman and reported depression.   (Tr. 336).   Dr. Baughman observed that Plaintiff's judgment and insight were grossly intact.  (Tr. 336).   On February 22, 2012, Plaintiff sought follow-up treatment for depression.   (Tr. 331-32).   Plaintiff reported that the anti-depression medication has been working well and that he is doing well.  (Tr. 331).   Dr. Baughman observed that Plaintiff's judgment and insight were grossly intact.  (Tr. 331).

On April 25, 2012, Mr. Hellyer (under Dr. Baughman's supervision) noted that Plaintiff was anxious and seemed "easily irritated and angered" and he changed Plaintiff's medication to Cymbalta.  (Tr. 439).

---

[2] In a claimant's earnings record, a "c" indicates that a claimant has earned enough to qualify for a quarter of coverage and an "n" indicates that the threshold amount was not earned in a given year.  *See* "Understanding an earnings record," 1 Soc. Sec. Disab. Claims Prac. & Proc. § 5:21 (2nd ed.).  For example, in 2000, "cccc" would indicate that a claimant has earned at least $780 each quarter of 2000 and "cccn" would indicate that a claimant earned at least $780 for the first three quarters of 2000. *See Weidman v. Colvin*, No. CV 3:14-552, 2015 WL 5829788, at *11 n. 4 (M.D. Pa. Sept. 30, 2015).

On May 16, 2012, Plaintiff sought treatment for anxiety after experiencing an anxiety attack and seeking emergency treatment. (Tr. 437). Dr. Baughman observed that Plaintiff's judgment and insight were grossly intact. (Tr. 437-38). On June 6, 2012, during a visit to address a concern regarding his skin. (Tr. 435). Dr. Baughman observed that Plaintiff's judgment and insight were grossly intact. (Tr. 435).

### 2. Mental Health Counseling: Pamela McDermott, L.C.S.W.

On June 25, 2012, Plaintiff commenced outpatient mental health treatment with Ms. McDermott. (Tr. 344). Plaintiff wanted an effective coping strategy to manage his anxiety. (Tr. 344). Plaintiff reported being diagnosed with ADHD in 1993 and dyslexia. (Tr. 344). Plaintiff reported that his mother lives nearby and oversees his schedule, finances and housing. (Tr. 344). Ms. McDermott wrote that Plaintiff "has a history of minimal pay jobs of short duration." (Tr. 344). Ms. McDermott summarized that:

> His impulse control is sporadic. [Plaintiff] can be an open cooperative conversant in therapy with entire attention on him and non threatening setting. Any interaction with public, community, coworkers usually escalates into hostility. [Plaintiff's] two sisters have some contact with him and he says a "few'' neighbors have superficial relationship. . . . [Plaintiff] has been at residence five years, lives alone but mother continually monitors his safety and welfare. . . . [Plaintiff] has difficulty with organizing thoughts or planning a schedule, focus and concentration are marginal. His social skills or lack of are problematic. He is usually pugnacious and quickly alienates people. Obsessive compulsive tendencies have been woven through his life. Ben has been prescribed Cymbalta and reports positive response. . . .

> He likes to converse in non threatening setting, which for [Plaintiff] is remarkable. [Plaintiff's] prospects for employment are guarded with anxiety, limited focus and concentration.

(Tr. 344).

On July 7, 2012, Plaintiff discussed his relationship history and reported that he has primarily lived alone throughout his adulthood.   (Tr. 343).   Plaintiff reported that his "anger is controlled for short periods of time" and that his limited impulse control jeopardizes his interactions with others.   (Tr. 343).   Plaintiff reported he likes night hours, however, his erratic sleep schedule exacerbates his anxiety.   (Tr. 343)   Ms. McDermott observed that Plaintiff "seem[ed] to readily process his feelings of anger and anxiety."   (Tr. 343).

On July 16, 2012, Ms. McDermott completed a form regarding the severity of Plaintiff's mental impairments.   (Tr. 345-46).   Ms. McDermott checked boxes indicating that Plaintiff experienced extreme limitations in the ability to: 1) tolerate work stress/pressure; 2) perform tasks/activities within a schedule; 3) work with or near others without being distracted; 4) Respond appropriately to changes in the work setting; 5) Fulfill quota or production requirements.   (Tr. 344-45).   Ms. McDermott checked boxes indicating that Plaintiff experienced marked limitations in the ability to: 1) understand and remember short, simple instructions; 2) understand and remember detailed instructions; 3) maintain attention/concentration during an 8-hour day; 4) complete a normal workday or workweek; 5) accept

instructions/respond appropriately to criticism; 6) interact appropriately with the public; 7) interact appropriately with co-workers and peers; 8) sustain an ordinary routine without special supervision; and, 9) make simple work-related decisions. (Tr. 344-45).   Ms. McDermott listed diagnostic codes 296.02 (Bipolar I Disorder, Single Manic Episode, Moderate) and 309.28 (adjustment disorder With Mixed Anxiety and Depressed Mood).   (Tr. 346).   Ms. McDermott checked that Plaintiff demonstrated: 1) feelings of worthlessness; 2) mood disturbance; 3) obsessive-compulsive behavior; 4) social immaturity; 5) attention difficulty; 6) poor judgment; 7) inappropriateness; 8) lack of insight; 9) agitation/irritability; and, 10) low self-esteem.   (Tr. 346).   Ms. McDermott checked "yes" that Plaintiff had "a residual disease process of at least 2 years duration that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate."   (Tr. 346).   Ms. McDermott checked "yes" that Plaintiff had live one or more years unable to function outside a highly supportive living arrangement and that Plaintiff's impairments would cause him to be absent more than two times per month.   (Tr. 346).   Ms. McDermott indicated that Plaintiff could not manage benefits in his own interest and that her judgement was based on Plaintiff's medical records "as opposed to exclusive reliance on the patient's subjective complaints."   (Tr. 346).

On October 11, 2012, Ms. McDermott noted that sometimes Plaintiff can sort reality from distortion, his impulsivity in work situations had led to his dismissal, and his political commentary at times could be construed as harassment in a work setting. (Tr. 503). Ms. McDermott stated that Plaintiff "has lost many jobs. It would be a challenge to find any type of employment congruent with [his] mental illness. . . . [He' doesn't seem to have any skills that are employable." (Tr. 503).

On October 24, 2012, Ms. McDermott noted that Plaintiff begins every session discussing an encounter with a distorted perception of an event or statement directed towards him. (Tr. 502). Ms. McDermott stated that he could not examine his role without being guided through the actual incident "which in most situations has been embellished to a point of minimal reality. (Tr. 502). Ms. McDermott stated that Plaintiff seeks arguments or conflict for situations that do not warrant such a response and is aware that he has delusional thoughts. (Tr. 502).

On December 5, 2012, Ms. McDermott noted that Plaintiff has difficulty appreciating that his mental illness does not attract people and they are likely apprehensive because of his obviously angry demeanor. (Tr. 500).

On December 19, 2012, Ms. McDermott noted that Plaintiff is aware of the complexity of his distortions and psychotic features of his depression are more

evident with treatment.   (Tr. 499).   "His thoughts are more times than not distorted" and "seldom ever in a positive pleasant mood. . . . Anger is his theme or at least anxiety." (Tr. 499).

On January 3, 2013, Ms. McDermott noted that Plaintiff's affect can be unsettling and angry but he would more likely engage in self-harm than harming others, however, people who did not know him would not be aware of this.  (Tr. 497).  They discussed how he could avoid confrontation by leaving the area.  (Tr. 497).  On January 30, 2013, Plaintiff reported that since he sleeps all day, he likes to "hang" at a local store, however, his demeanor and conversation seemed to have unsettled customers.  (Tr. 496).  He had been asked not to loiter there, which angered Plaintiff but he did not engage in any verbal attack against any of the management of the store.  (Tr. 496).

On February 15, 2013, Ms. McDermott noted that the way Plaintiff expresses himself "could alarm anyone who doesn't know or aware of his personality psychotic features."  (Tr. 495).  Plaintiff voices opposition to any government without a basis in reality to much of his commentary. (Tr. 495).  Ms. McDermott wrote that Plaintiff was very critical of people in power of his perception of their power and most "of his choice for usual conversation would frighten people."  (Tr. 495).  Ms. McDermott wrote that Plaintiff would become

"very righteous about subjects that for most people would not warrant the emotional level." (Tr. 495).

On March 1, 2013, Ms. McDermott tried to discuss cognitive restructuring which was difficult for Plaintiff to grasp because he "can't appreciate any other view point than his own misguided reality." (Tr. 494). Ms. McDermott noted that Plaintiff approaches his environment with hostility, however, "not everyone is a potential enemy." (Tr. 494). Plaintiff is frustrated with her requests to engage in minimal interaction with anyone. (Tr. 494). Ms. McDermott stated that Plaintiff "will listen to therapeutic reasoning but I know he will never incorporate or ever consider. He is not dangerous, but his affect usually causes more alienation than attraction. (Tr. 494).

On March 14, 2013, Ms. McDermott noted that Plaintiff likes to discuss current affairs and politics and he likes to share his opinions with anyone willing to listen to him but when he used to work; most of the co-workers did not want to engage in dialogue with him. (Tr. 493). Plaintiff said that he benefited from therapy since few people were willing to listen to him. (Tr. 493). Plaintiff said that his communication style projects hostility and Ms. McDermott told him to try thinking before reacting. (Tr. 493). When trying to discuss how his affect offends most people, his response that it was other people's problem. (Tr. 493).

On March 28, 2013, Plaintiff reported that his hallucinations are auditory and describes what he hears as anger and that whatever interaction he is experiencing is eclipsed by anger. (Tr. 492). Ms. McDermott stated that Plaintiff seemed to be managing anger more effectively with medication and therapy, but seems to cope with his distorted thoughts when he is alone and less provoked outside stimulus. (Tr. 492).

On April 11, 2013, Plaintiff reported feeling most secure in his home with his cat. (Tr. 491). Plaintiff reported that people aggravate him and more outside stimulation would contribute to distortions. (Tr. 491). Plaintiff reports that his mother thinks he is a 'hoarder' but Plaintiff states that the only thing giving rise to that accusation are the empty soda bottles lying around his home and denies that it is a health risk. (Tr. 491). Plaintiff reported that he punches holes in the walls at home when he is angry and that his choice to express his anger this way "hurts no one." (Tr. 491).

On April 25, 2013, Plaintiff reported that his mood and behavior seem more stable with medication and he notices a positive difference with the medication. (Tr. 490). Plaintiff reported experiencing "transient hallucinations – thoughts that seem intrusive 'not his own'" and recognizes that he does not think like most people. (Tr. 490). Ms. McDermott wrote that Plaintiff "could not be described as ever 'manic' I have rarely seen him as even tempered. His affect and disposition

are typically depressed. (Tr. 490). Ms. McDermott stated that it was "noteworthy" that Plaintiff would consider that his neighbors and refrain from playing drums even though it helps him cope with his symptoms. (Tr. 490). Plaintiff reported that therapy helped him process his thoughts and deescalate his "free flowing anger." (Tr. 490).

On May 9, 2013, in response to questioning, Plaintiff replied that he did not think seasons had any impact on his mood. (Tr. 489). Plaintiff reported that he walks or uses the bus for appointments, but prefers to remain in his mobile home, only venturing out for supplies. (Tr. 489). Plaintiff reported that his meals are mostly packaged or prepared foods that he can microwave. (Tr. 489). Plaintiff wasn't "interested or capable of using outdoors/exercise to lower his anxiety – it might deescalate his anger, too." (Tr. 489). On May 28, 2013, Plaintiff was looking forward to visiting his sister and discussed how his sisters were tolerant of his mood and behavior. (Tr. 488).

On June 11, 2013, Plaintiff discussed his feeling for his father who died in 2004. (Tr. 487). On June 25, 2013, Plaintiff discussed a recent visit with his sister. (Tr. 486). Plaintiff reported that he thinks his family judges him and does not understand his mental illness. (Tr. 486). Plaintiff reported that he can feel intrusive thoughts when he becomes agitated, but knows how to isolate himself from family to prevent escalating anger. (Tr. 486). Plaintiff reported that close

proximity to people is a trigger.  (Tr. 486).  Plaintiff stated that there has been some discussion in the family regarding his future and he has recognized that he could not handle his finances and would like one or both of his sisters to have power of attorney over his affairs.  (Tr. 486).

On June 22, 2013, Ms. McDermott submitted a form indicating that the extent of Plaintiff's mental limitations which were still the same as those described in the July 2012 opinion.  (Tr. 526).  Ms. McDermott added that over the course of over twenty-four sessions, she observed Plaintiff's mood to be congruent with psychotic features, delusions thoughts, and transient auditory hallucinations.  (Tr. 527).  Ms. McDermott stated that although she had observed some emotional stability with medications, any task or sometimes a cursory exchange would aggravate Plaintiff.  (Tr. 527).

### 3.  Hershey Medical Center: John E. Neely, M.D.; Christopher Bloomer, M.D.; Lawrence E. Kass, M.D.; Bret C. Jacobs, D.O.

Records dated from 1989 through 1999 detail Plaintiff's treatment and remission for non-Hodgkin's lymphoma in the brain and subsequent psychological and cognitive impairment.  (Tr. 365-402).  On October 1, 1990, Dr. Neely noted that Plaintiff had non-Hodgkin's lymphoma with an MRI showing bilateral temporal lobe lesions.  (Tr. 359).

In a letter dated April 29, 1997, Dr. Neely noted that Plaintiff was diagnosed in August 1989 of non-Hodgkin's lymphoma.  (Tr. 350).  Dr. Neely noted that

Plaintiff had "significant psychological problems," was doing better with his attention span and productivity since commencing Cylert, was enrolled in college and working nearly full time.  (Tr. 350).  Plaintiff reported feeling very stressed and angry at times, recognized that counseling has helped in the past, and agreed he would seek counseling again.  (Tr. 350).

On October 16, 2008, a CT scan of Plaintiff's head and Dr. Bloomer noted that the soft tissues were "grossly unremarkable" and that "[b]ilateral parieto-occipital white matter hypodensity [was] due to chronic small vessel disease.  (Tr. 418).

On January 31, 2013, Plaintiff commenced outpatient treatment after being turned away from Dr. Baughman's practice due to failing to produce a urine sample for his lorazepam prescription.  (Tr. 523).  Plaintiff reported that since being off of his medication for the past two months, he has been experiencing homicidal ideation and had developed a list of people he wanted to harm without any specific plan or intent to carry out any harm.  (Tr. 523).  Plaintiff reported that his suicidal and homicidal ideation was well controlled with Cymbalta.  (Tr. 523).  Upon examination Dr. Jacobs observed that Plaintiff appeared "somewhat anxious," dressed well, answered questions appropriately, and denied any active homicidal or suicidal ideation.  (Tr. 524).  Plaintiff also reported experiencing "some visual as well as questionable auditory hallucinations in the past."  (Tr.

524).  Dr. Jacobs discussed referral to a psychologist but Plaintiff stated that he felt comfortable and stable with his current therapist.  (Tr. 524).

On March 13, 2013, Plaintiff sought outpatient treatment for anxiety and depression.  (Tr. 518).  Dr. Jacobs noted that Plaintiff was doing "quite well" on Cymbalta and Plaintiff reported that he only needed to use lorazepam intermittently.  (Tr. 518).  Plaintiff felt that overall he was doing well.  (Tr. 518).  Dr. Jacobs stated that while it was beneficial for Plaintiff to continue therapy with his counselor, he would also benefit from psychiatric care.  (Tr. 519).

On April 13, 2013, Plaintiff sought emergency treatment for an anxiety attack following taking an over the counter herbal supplement.  (Tr. 474).  Shortly after taking the supplement at 6:00 p.m., Plaintiff "started feeling shaky and numbness in his fingers, feet, and twitching of his face at 630pm."  (Tr. 474).  Plaintiff vomited at 7:00 p.m. and was nauseous, shaking, and anxious while at the emergency department.  (Tr. 474).  Plaintiff reported that he ran out of his prescription of Ativan the prior month, which he takes as needed for anxiety.  (Tr. 474).

### 4.  Pinnacle Health Hospital

On May 11, 2012, Plaintiff sough emergency treatment due to an anxiety attack where he was observed hyperventilating.  (Tr. 420-28).  Plaintiff reported that the anxiety attack was prompted by financial stressors.  (Tr. 424).  Plaintiff

reported that he was coming into the city on a bus in order to pay a bill when he started feeling nausea and tingling in his hands and feet.  (Tr. 424-25).  Plaintiff reported that the last time he experienced a panic attack was in 1995 and it involved seizure-like activity and he started having panic attacks in 1991 while he was receiving treatment for his spinal cancer, but had not been on any medications or had recurrent problems since then.  (Tr. 425).  Plaintiff reported that he was stressed about the possibility of losing his home, fighting disability, and his mother leaving toward the end of the month.  (Tr. 424-25).

### 5.  Psychiatric Review Technique: John Hower, Ph.D.

On March 19, 2012, Dr. Hower reviewed hospital records, treatment records from his primary care physician, Dr. Braughman, statement from Plaintiff's mother, and Plaintiff's self-reports to render an opinion regarding Plaintiff's mental limitations.  (Tr. 75-81).  Dr. Hower opined that Plaintiff was not significantly limited in the ability to: 1) remember locations and work-like procedures; 2) understand and remember very short and simple instructions; 3) carry out very short and simple instructions; 4) maintain attention and concentration for extended periods; 5) sustain an ordinary routine without special supervision; 6) work in coordination with or in proximity to others without being distracted by them; 7) make simple work-related decisions; 8) interact appropriately with the general public; 9) ask simple questions or request assistance;

10) maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness; respond appropriately to changes in the work setting; 11) be aware of normal hazards and take appropriate precautions; and, 12) to travel in unfamiliar places or use public transportation. (Tr. 79-81).

Dr. Hower further opined that Plaintiff was moderately limited in the ability to: 1) understand and remember detailed instructions; 2) carry out detailed instructions; 3) perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; 4) complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without and unreasonable number and length of rest periods. (Tr. 80-81).

### 6. Consultative Examination: Christopher Royer, Psy.D

On April 26, 2013, Dr. Royer saw Plaintiff for a neuropsychological consultative evaluation. (Tr. 477-485). Plaintiff reported that in 1989 he was diagnosed with non-Hodgkin's CNS lymphoma, had chemotherapy, and then cranial radiation. (Tr. 477). Plaintiff reported that after the radiation treatment, an MRI demonstrated "scarring on [his] brain." (Tr. 477). Plaintiff reported that the cancer went into remission, and then after it came out of remission, he received a stem cell transplant and chemotherapy. (Tr. 477). Plaintiff stated that he could not "think or figure things out inside [his] brain" and that he has to "hear it or think out

loud." (Tr. 477).  As a result Plaintiff will talk to himself and he cannot count in his head.  (Tr. 477).  Plaintiff reported that his memory is very poor and that he has to write things down or put it in his phone.  (Tr. 477-78).

Plaintiff reported that he places notes in his path so that he will see them and remember to do things and he used to write things on his hand.  (Tr. 478).  Plaintiff reported that he had trouble with memory and attention in school before his cancer and diagnosed with attention deficit hyperactivity disorder ("ADHD") in 1993. (Tr. 478).  Plaintiff reported a great deal of anxiety and experiences shaking, shortness of breath, and muscle spasms.  (Tr. 478).  He stated that he takes lorazepam as needed, and sometimes he feels the need to take more than three a day and that he also takes Cymbalta and finasteride.  (Tr. 478).  Plaintiff reported feeling depressed and that he has suicidal ideation but he would never act upon it. (Tr. 478).

Plaintiff reported experiencing a lot of family discord currently stating that his mom "thinks [he has] OCD and [he is] a hoarder."  However, he calls it "being lazy."  (Tr. 478).  Plaintiff reported that at his last job he worked for three weeks and was fired about sixteen month ago due to customer complaints about coffee. (Tr. 478).  Plaintiff reported that he worked for one branch of a retail store in Maryland for two and a half years and then a different branch for the same store in Pennsylvania for four and a half years.  (Tr. 478).  Plaintiff stated that at the retail

position he was expected to do things above his ability and was fired for stomping on a box. (Tr. 478). Plaintiff reported a history of anger problems and therapy with a current "temper" problem directed towards specific people who distress him. (Tr. 478). Plaintiff felt that his mother was over-involved with his case. (Tr. 478). Dr. Royer observed that Plaintiff was:

> pleasant, talkative, and cooperative during the assessment, and related well interpersonally. His demeanor was candid with an appropriate sense of humor, and he appeared to be comfortable working one-to-one. [Plaintiff] was able to understand standardized instructions, and carried out tasks as directed without difficulty. While his effort was good, he did need redirection throughout the assessment process. His approach to the assessment varied depending upon the task. On some measures, Mr. Resnick worked slowly and methodically; however, on others where he appeared to feel more comfortable, he was more impulsive. [Plaintiff] had some difficulty inhibiting his internal thoughts which he verbally expressed out loud. However, he was easily redirected. Formal validity testing reflected his inattentiveness. . . . Overall, the results are considered to be an adequate sampling of his current neurocognitive abilities within the domains assessed below . . .

(Tr. 479). Dr. Royer listed the various cognitive and psychological tests administered. (Tr. 478-79). Dr. Royer opined that Plaintiff was fully oriented, able to state the day of the week, day of the month, month and year, was oriented to current time of day, as well as to location and remote personal information. (Tr. 479). Dr. Royer summarized that Plaintiff's examination results revealed generally "average" for processing speed, working memory, and intellectual functioning. (Tr. 479-80). Plaintiff's examination results demonstrated: 1) borderline visual-

motor coordination; 2) moderate impairment in the "sustained attention accuracy score" "list learning", and delayed recall after thirty minutes; and 3) low average "sustained attention speed score," and "logical, abstractive (categorical) thinking."

(Tr. 479-81). In response to an emotional and personality questionnaire, Plaintiff:

> endorsed many items, suggesting that he [was] experiencing a substantial level of psychological distress. He indicated that he is experiencing significant depression at this time. He worries, and he does not feel that there are any times that he does not have these symptoms. He tends to see the world in a very negative light He does not feel that things will ever work out, and as such, he is pessimistic about virtually any new venture. He tends to withdraw from others, and he does not see others as a mode of support for him. He sees himself as thinking contrary to most people, and he may not find it possible to feel empathy in the face of others' concerns.

(Tr. 482). Dr. Royer opined that Plaintiff:

> demonstrates a number of significant cognitive deficits. He struggles on tests of sustained attention. He exhibits impaired memory functions, particularly when organizational skills are involved. His scores also reflect impaired mental flexibility. In general, deficits in the area of executive functions are correlated with poor functioning at work and in the community. His exposure to radiation and the lengthy course of chemotherapy have likely served to cause and exacerbate his cognitive impairments. Moreover, he presents with a broad array of emotional difficulties, spanning depression and anxiety, as well as more chronic negativistic thinking and a profound difficulty with interpersonal relationships.

(Tr. 482-83). Dr. Royer opined that Plaintiff met the DSM-IV diagnostic classifications for ADHD, cognitive disorder NOS, and bipolar I disorder with

avoidant and antisocial tendencies.  (Tr. 483).  Dr. Royer assessed Plaintiff with a

GAF score of 47. [3]  Dr. Royer opined that:

> At the current time, I cannot imagine a scenario in which he would be able to maintain competitive employment with this level of cognitive and emotional symptomatology. The combined effects of medical, cognitive and psychiatric problems are substantial, and will negatively impact his goals in all areas of life.

(Tr. 483).

In an attached assessment form, Dr. Royer filled check marks indicating that

Plaintiff had extreme limitations in the ability to: 1) maintain

attention/concentration during an 8-hour day; 2) complete a normal workday or

workweek; and, 3) fulfill quota or production requirements.  (Tr. 484).  Dr. Royer

also indicated that Plaintiff had marked limitations in the ability to: 1) tolerate

work stress/pressure; 2) understand and remember detailed instructions; 3) accept

---

[3] See *Schwartz v. Colvin*, 3:12-CV-01070, 2014 WL 257846 at *5, n. 15 (M.D. Pa. Jan. 23, 2014) ("The GAF score allows a clinician to indicate his judgment of a person's overall psychological, social and occupational functioning, in order to assess the person's mental health illness. *Diagnostic and Statistical Manual of Mental Disorders* 3–32 (4th ed.1994). . . . The GAF is within a particular range if *either* the symptom severity *or* the social and occupational level of functioning falls within that range. When the individual's symptom severity and functioning level are discordant, the GAF rating reflects the *worse* of the two. Thus, a suicidal patient who is gainfully employed would have a GAF rating below 20. . . . A GAF score of 21–30 represents behavior considerably influenced by delusions or hallucinations or serious impairment in communication or judgment or inability to function in almost all areas. A GAF score of 31–40 represents some impairment in reality testing or communication or major impairment in several areas, such as work or school, family relations, judgment, thinking or mood. *Id.* A GAF score of 41–50 indicates serious symptoms or any serious impairment in social, occupational or school functioning. *Id.* A GAF score of 51 to 60 represents moderate symptoms or any moderate difficulty in social, occupational, or school functioning. *Id.* A GAF score of 61 to 70 represents some mild symptoms or some difficulty in social, occupational, or school functioning, but generally functioning pretty well with some meaningful interpersonal relationships. *Id.*").

instructions/respond appropriately to criticism; 4) interact appropriately with the public; 5) interact appropriately with co-workers and peers; 6) work with or near others without being distracted; and, 7) respond appropriately to changes in the work setting.  (Tr. 484).  Dr. Royer also indicated that Plaintiff had moderate limitations in the ability to: 1) perform tasks/activities within a schedule; 2) understand and remember short, simple instructions; 3) sustain an ordinary routine without special supervision; and, 4) make simple work-related decisions.  (Tr. 484).  Dr. Royer checked that Plaintiff demonstrated: 1) feelings of worthlessness and helplessness;  2)  mood  disturbance;  3)  concentration  difficulty;  4) hypervigilance; 5) attention difficulty; 6) poor judgment; 7) agitation/irritability; 8) memory difficulty; 9) low self-esteem; and 11) hyperactivity.  (Tr. 485).

Dr. Royer checked "yes" that Plaintiff had "a residual disease process of at least 2 years duration that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate" and would miss a day of work or leave work unexpectedly three or more times per month.  (Tr. 485).  Dr. Royer checked "no" that Plaintiff had live one or more years unable to function outside a highly supportive living arrangement.  (Tr. 485).  Dr. Royer indicated that Plaintiff could manage benefits in his own interest and that the extent of plaintiff's disabling limitations had existed since December 5, 2011.  (Tr. 485).  Dr. Royer indicated

that he based his opinions on medical judgement, examinations, and medical records as opposed to exclusive reliance on Plaintiff's subjective complaints. (Tr. 485).

## III.   Legal Standards and Review of ALJ Decision

To receive disability or supplemental security benefits, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *accord* 42 U.S.C. § 1382c(a)(3)(A). A claimant for disability benefits must show that he or she has a physical or mental impairment of such a severity that:

> [H]e is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. § 423(d)(2)(A); 42 U.S.C. § 1382c(a)(3)(B).

The Commissioner uses a five-step evaluation process to determine if a person is eligible for disability benefits. 20 C.F.R. § 404.1520; *accord Plummer*, 186 F.3d at 428. If the Commissioner finds that a Plaintiff is disabled or not disabled at any point in the sequence, review does not proceed. 20 C.F.R. § 404.1520(a)(4). The Commissioner must sequentially determine: (1) whether the

claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant's impairment prevents the claimant from doing past relevant work; and, (5) whether the claimant's impairment prevents the claimant from doing any other work.  20 C.F.R. §§ 404.1520, 416.920.  Before moving on to step four in this process, the ALJ must also determine Plaintiff's residual functional capacity ("RFC").  20 C.F.R. §§ 404.1520(e), 416.920(e).

The disability determination involves shifting burdens of proof.  The claimant bears the burden of proof at steps one through four.  *See Mason v. Shalala*, 994 F.2d 1058, 1064 (3d Cir. 1993).  If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Id.*  The ultimate burden of proving disability within the meaning of the Act lies with the plaintiff.  *See* 42 U.S.C. § 423(d)(5)(A); 20 C.F.R. § 416.912(a).

When reviewing the Commissioner's decision denying a claim for disability benefits, the Court must uphold the findings of the Commissioner so long as those findings are supported by substantial evidence.  *See Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir. 1988); *Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 200 (3d Cir. 2008).  Substantial evidence is a deferential standard of review.  *See Jones v.*

*Barnhart*, 364 F.3d 501, 503 (3d Cir. 2004).  Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Pierce v. Underwood*, 487 U.S. 552, 564 (1988) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)).  Substantial evidence requires only 'more than a mere scintilla' of evidence, *Plummer v. Apfel*, 186 F.3d 422, 427 (3d Cir. 1999) (quoting *Ventura v. Shalala*, 55 F.3d 900, 901 (3d Cir. 1995)), and may be less than a preponderance.  *Jones*, 364 F.3d at 503.  If a reasonable mind might accept the relevant evidence as adequate to support a conclusion reached by the Commissioner, then the Commissioner's determination is supported by substantial evidence.  *Monsour Med. Ctr. v. Heckler*, 806 F.2d 1185, 1190 (3d Cir. 1986); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999); *Johnson*, 529 F.3d at 200.

## A. Duty to Develop Evidence

Plaintiff argues that the ALJ erred in favoring the non-examining consultative opinion of Dr. Hower rendered in March 2012 over subsequent opinions from the examining consultative opinion of Dr. Royer (April 2013 opinion, Tr. 477-485) and from Plaintiff's treating therapist Ms. McDermott (July 2012 opinion, Tr. 345-46; June 2013 supplemental statement, Tr. 526-27).  Pl. Brief at 10-15.

The presence of a medical opinion in the record that supports the ALJ's denial does not automatically establish that substantial evidence supports the denial.    Sections 404.1519 and 416.919 of Title 20 of the Code of Feral Regulations directly address when the ALJ may secure medical opinion evidence: when there is an unresolved conflict or the evidence is insufficient to make a determination.    20 C.F.R. §§ 404.1519, 416.919.    The Court also notes that *Chandler* provides that*:*

> [B]ecause state agency review precedes ALJ review, there is always some time lapse between the consultant's report and the ALJ hearing and decision. The Social Security regulations impose no limit on how much time may pass between a report and the ALJ's decision in reliance on it. Only where "additional medical evidence is received that in the opinion of the [ALJ] . . . may change the State agency medical . . . consultant's finding that the impairment(s) is not equivalent in severity to any impairment in the Listing," is an update to the report required. The ALJ reached no such conclusion in this case.

*Id.* 361 (citations omitted).    However, this statement in *Chandler* must be construed in light of other duties imposed on the ALJ.  *See Austin v. Colvin*, No. 1:13-CV-02878-GBC, 2015 WL 4488333 (M.D. Pa. July 23, 2015) ("passage of time is relevant when it requires the ALJ to undertake a significant independent review of probative, non-cumulative objective evidence") (internal citations omitted); *see also Staudt v. Colvin*, No. 1:13-CV-2904, 2015 WL 1605574, at *10 (M.D. Pa. Apr. 9, 2015).

In this instance, the opinion of Dr. Royer encompasses interpretation of a number of cognitive and psychological tests, and the first substantive evaluation of Plaintiff based on observations made in-person. (Tr. 477-485). "It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." *Sims v. Apfel,* 530 U.S. 103, 111, 120 S.Ct. 2080, 147 L.Ed.2d 80 (2000); *see also Ventura v. Shalala,* 55 F.3d 900, 902 (3d Cir.1995) (citing *Hess v. Secretary of Health, Education and Welfare*, 497 F.2d 837, 841 (3d Cir.1981) (holding that "an ALJ must secure relevant information regarding a claimant's entitlement to social security benefits"). Dr. Hower's opinion, alone, does not satisfy the substantiality test. *See Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). As the Court in *Morales v. Apfel*, observed:

> A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by counterveiling evidence. Nor is evidence substantial if it is overwhelmed by other evidence—particularly certain types of evidence (e.g., that offered by treating physicians)—or if it really constitutes not evidence but mere conclusion.

*Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000). Dr. Hower's opinion is a "single piece of evidence" and the ALJ "fail[ed] to resolve a conflict created by counterveiling evidence," specifically, evidence from Dr. Royer's interpretation of clinically significant tests and evaluation. *See id.* As Dr. Royer's opinion is substantive probative evidence that may have led Dr. Hower to render an opinion that was favorable to Plaintiff, the Court recommends remand for the ALJ to

properly develop the record to allow for meaningful judicial review of the credibility assessment.

## B. Other Allegations of Error

Because the Court recommends remand on these grounds, it declines to address Plaintiff's other allegations. A remand may produce different results on these claims, making discussion of them moot. *See LaSalle v. Comm'r of Soc. Sec.*, No. CIV.A. 10-1096, 2011 WL 1456166, at *7 (W.D. Pa. Apr. 14, 2011).

## IV.    Recommendation

Accordingly, it is HEREBY RECOMMENDED:

1.    The decision of the Commissioner of Social Security denying Plaintiff's social security disability insurance be vacated and the case remanded to the Commissioner of Social Security to develop the record fully, conduct a new administrative hearing and appropriately evaluate the evidence in accordance with the Court's above report; and

2.    The Clerk of Court close this case.

The parties are further placed on notice that pursuant to Local Rule 72.3:

Any party may object to a Magistrate Judge's proposed findings, recommendations or report addressing a motion or matter described in 28 U.S.C. § 636 (b)(1)(B) or making a recommendation for the disposition of a prisoner case or a habeas corpus petition within fourteen (14) days after being served with a copy thereof. Such party shall file with the clerk of court, and serve on the Magistrate Judge and all parties, written objections which shall specifically identify the portions of the proposed findings,

recommendations or report to which objection is made and the basis for such objections. The briefing requirements set forth in Local Rule 72.2 shall apply.

A Judge shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The Judge, however, need conduct a new hearing only in his or her discretion or where required by law, and may consider the record developed before the magistrate judge, making his or her own determination on the basis of that record. The Judge may also receive further evidence, recall witnesses or recommit the matter to the Magistrate Judge with instructions.


Dated: March 22, 2016                    *s/Gerald B. Cohn*
                                                GERALD B. COHN
                                       UNITED STATES MAGISTRATE JUDGE